Titone, J.
(dissenting). The Trial Judge in this case elected to experiment with the jury selection process by first gathering a large complement of prospective jurors — 48 instead of the usual 12 (see, CPL 270.15) — and then devising a system for conducting the voir dire in order to resolve the logistical problems that were created by the use of such a large venire panel.* In the process, both the letter and the spirit of our holding in People v Antommarchi (80 NY2d 247) were transgressed. Because the defendant’s right to be present during the particularized substantive questioning of jurors was not respected and because defendant did not effectively waive that personal right, we conclude that the judgment of conviction should be reversed.
Initially, we note that the majority’s rationale for affirmance does not withstand scrutiny. At one point, the majority states that the judgment should be affirmed because the record is insufficient to support defendant’s claims (majority opn, at 562). At another point, the majority concludes that the record reveals a facially appropriate "preliminary screening” procedure that was first "expressly articulated” by the Trial Judge and was "then carried * * * out reasonably and substantially” (majority opn, at 563). Ironically, however, it is the trial court’s own description of her plan and the plan’s recorded implementation that belie the conclusion the majority has reached.
At the outset of the jury selection process, the Trial Judge told defense counsel that if defendant did not consent to waive his Antommarchi rights, she would use her own accustomed procedure. Under that procedure, a preliminary "screening” would be conducted at the Bench, "and then,” according to the court, "anybody who has an issue which is an Antommarchi issue” would be identified and subjected to further questioning *565 in defendant’s presence. In other words, the "screening” discussions at the Bench would consist of questions aimed at discovering the existence of relationships, prior experiences or attitudes that might affect the jurors’ ability to be objective. Manifestly, those are precisely the areas that must be reserved for exploration in the defendant’s presence under Antommarchi (see, People v Antommarchi, supra, at 250; People v Sprowal, 84 NY2d 113, 117; People v Sloan, 79 NY2d 386; cf., People v Velasco, 77 NY2d 469).
With respect to the implementation of the Trial Judge’s plan, any remaining doubt about what was actually discussed in the private Bench conferences is dispelled by the Trial Judge’s own statements to the prospective jurors after they were brought into the courtroom and seated. The jurors were told that they would be asked to approach the Bench and "share” their personal information with the court if "any of you” "has ever been arrested or convicted of a crime,” "[been] involved in [the] criminal justice system in any way,” "had any kind of a drug problem,” or "[has] anything in your background which makes you feel that you could not be fair.” Having thus described the relevant concerns, the court went on to tell the jurors that "the court officers will talk to you row by row and see if any of you need to see me individually.” At no point in this instruction did the Trial Judge mention any "personal disqualification or disability” (majority opn, at 561) such as a physical incapacity or a scheduling problem as an alternative reason for alerting the court officer and approaching the Bench.
The only rational inference that can be drawn from this record is that the ensuing private Bench conferences concerned the topics on which the court had explicitly solicited discussion. Indeed, in order to draw the contrary inference or to suggest, as the majority has, that the Bench conferences concerned some personal disqualification or disability, one would have to assume that both the court officers and the jurors had failed to understand what the Judge was looking for — a highly unlikely occurrence, particularly in view of the fact that the "screening” system was apparently part of this Judge’s regular practice.
In sum, it is clear beyond peradventure that the disputed Bench conferences concerned matters that required defendant’s presence under Antommarchi and that, accordingly, defendant’s "burden” under People v Maher (89 NY2d 318, 325) is satisfied by this appellate record. Moreover, even if that were not the case, the majority’s assertion that the court’s an *566 nounced plan was valid on its face is misplaced, since that plan expressly called for private discussions about matters affecting objectivity and fairness — discussions requiring the defendant’s presence under Antommarchi. Surely, there can be no argument that an otherwise forbidden private sidebar can be validated by labeling it a "preliminary” or "screening” procedure. Similarly, the fact that no jurors other than the two who were recalled "were excused at the Bench screening stage” (majority opn, at 562) does not cleanse the procedure of error, since, regardless of the Bench conference’s outcome, the "impressions [defendant would have] gained from seeing and hearing the juror’s responses” might " 'have been useful in ensuring a more reliable determination’ ” or in providing fodder from defendant’s meaningful input into his counsel’s choices (see, People v Roman, 88 NY2d 18, 26, quoting People v Morales, 80 NY2d 450, 454). Once it is determined that, as here, the accused was excluded from a Bench conference concerning possible general or specific bias, the only salient question for consideration is whether, as discussed in People v Maher (supra, at 325) and People v Feliciano (88 NY2d 18, 28), "the record 'negate[s] the possibility that [the defendant] could have provided valuable input.’ ”
We know from the record before us that at least eight unrecorded Bench conferences with prospective jurors were held. Some insight into the contents of these conversations may be had from the subsequent colloquies that were recorded. For example, when prompted to "explain for the record” what he had said in private, one juror stated that as a mathematician he felt he would have difficulty with the reasonable doubt standard of proof. Another expressed concern that the concepts of entrapment, encouragement and accomplice liability would "cloud” her judgment. A third prospective juror acknowledged that during her private sidebar she had alluded to the fact that she had many friends in law enforcement positions. Although each of these jurors was excused under circumstances that did not suggest an opportunity for meaningful input by defendant (see, People v Roman, supra), the same cannot be said for the facts surrounding the questioning of juror S. (see, People v Roman, supra).
After having been examined in chambers without defendant’s presence, juror S. was again questioned in defendant’s presence. In response to questions by the court and defense counsel, juror S. stated that she was a recovering drug addict and alcoholic but that she felt she could be fair and could follow *567 the court’s legal instructions. Although it may be inferred from the context that these facts had been elicited during the private Bench conference, there is no basis for assuming that the entire discussion from which defendant had been excluded was "essentially replicated de novo in [defendant’s] presence” (People v Starks, 88 NY2d 18, 29). To the contrary, despite having been given an opportunity to do so, the prosecutor expressly declined to repeat in defendant’s presence the questions he had previously asked this juror in private.
Since juror S. was ultimately discharged peremptorily by the defense, it cannot be said that defendant’s exclusion from her private Bench conference may be excused because there was no possibility that he could have made a meaningful contribution to his attorney’s discretionary choice (see, People v Davidson, 89 NY2d 881; People v Roman, supra). Thus, it is clear that defendant’s rights under the Antommarchi principle were violated and that, accordingly, reversal of his conviction is required.
The fact that defense counsel may have consented to the court’s experimental procedure (see, majority opn, at 561-562) does not change the analysis, since defendant made it clear at the outset that he did not intend to waive his Antommarchi right. Similarly, to the extent that the majority relies on defense counsel’s presence at the Bench conferences as a legally significant "feature” (majority opn, at 561), its analysis overlooks the fundamental principle that the CPL 260.20 right to be present is personal to the defendant and has never been deemed to have been satisfied by the presence of counsel (see, People v Roman, supra, at 25; People v Sprowal, 84 NY2d 113, 117). Indeed, since the defendant’s personal presence is required in part "because of the potential input the defendant can give defense counsel” (People v Roman, supra, at 26), it is circular to cite counsel’s presence as a factor ameliorating the exclusion of the defendant himself.
In closing, I would note that while experimentation is permissible and perhaps even desirable, care must always be taken to ensure that the procedures the court devises do not impair the fundamental rights of the accused. Furthermore, although the right recognized in Antommarchi may be controversial, it has repeatedly been reaffirmed by this Court and is not to be circumvented or treated as a technical inconvenience to which only lip service must be paid. Regardless of whether the colloquy is labeled an "Antommarchi conference,” a "preliminary” sidebar or a "screening” discussion, the rule remains that any discussion with prospective jurors as to " 'bias, hostil *568 ity or predisposition to believe’ certain witnesses over others” must be conducted in the defendant’s presence (People v Vargas, 88 NY2d 363, 375, quoting People v Sprowal, supra, at 117). Since that rule was not followed here, I dissent from the majority’s decision to uphold the Appellate Division order affirming the conviction.
Chief Judge Kaye and Judges Smith, Levine and Wesley concur with Judge Bellacosa; Judge Titone dissents and votes to reverse in a separate opinion in which Judge Ciparick concurs.
Order affirmed.

 As a matter of experience and personal principle, Judge Titone would also take issue with the Trial Judge’s expansion of the "jury box” to encompass some 48 persons. Although the statute contemplates some small discretionary increases in the customary 12-person box (see, Mem of Off of Ct Admin, 1981 NY Legis Ann, at 168-169; Letter from Div Of Crim Justice Servs, Bill Jacket, L 1981, ch 301; Mem by T. Sullivan, Dist Atty, Richmond County, Bill Jacket, op. cit.), an expansion from the customary 12 to 48 prospective jurors could, in Judge Titone’s view, readily be considered so inimical to the effective conduct of voir dire as to constitute an abuse of discretion as a matter of law. However, since defendant’s trial counsel did not object to the procedure, its propriety cannot be considered here.